## *ALMON BAILEY v. N. W. OHIO NATURAL GAS CO.

1. LIABILITY LIMITED TO CONTRACTING PERSONS.

   The defendant, under a contract with S. Bros., put in fixtures for using natural gas
   for heating a steam boiler connected with the engine in the electric plant of S. Bros.
   The plaintiff was at the time the engineer of S. Bros., in charge of said boiler and
   engine. The first time the natural gas was used to heat the boiler, and while plain-
   tiff was so in charge of and operating said boiler and engine, the fire, owing, it is
   claimed, to the negligent manner in which the fixtures were put under the boiler
   by the defendant, so super-heated one part of the boiler as to cause it to explode,
   whereby the plaintiff was seriously injured.   Held:
   If a person does work or puts up an article for another, not in itself dangerous, and
   an injury arising is not from its nature, but from his negligent work, he is liable
   only to the person with whom he contracted, and as the contract relations of the
   defendant were with S. Bros. alone, his liability is to them only.

2. NOT LIABLE TO EMPLOYEES.

   That the defendant owed no duty to the plaintiff that rendered it liable to him for the
   alleged negligence of defendant, the gas not being *per se* dangerous.

HAYNES, J. (orally).

This case comes into this court by petition in error.   The original action was
brought by Almon Bailey, in the court of common pleas, against the Northwest-
ern Ohio Natural Gas Company, to recover for certain injuries received by him,
which were caused, as he claims, by the negligence of defendant company.

The facts of the case are substantially these:   The firm of Sheibley Brothers
were the owners, at Fostoria, of an electric plant, making use of a steam engine and
boiler, and that boiler was in charge of the plaintiff as an engineer, a young man
of limited experience.   This was in the fall of 1886, about the month of December.
It appears that the Sheibleys had been running this plant for at least a year.   The
boiler was set in an arch.   It is said to have been a boiler that was rather small for
the business.   When it was first erected, the arch extended up to about the water-
line of the boiler, which is about two-thirds the way up the boiler, or perhaps one-
third between the center line of the boiler and the top of the boiler, and at that
point the brick came within about four inches of the boiler, and then the walls set
in so as to prevent the heat from escaping.   In the fall of 1885, they had a Mr.
Lindsey change the arch, and constructed it over the boiler, leaving a space at
the top of about two inches, so that the space over the boiler, starting from the
water-line, had a width of about four inches, and would be about two inches on the
top of the boiler.   The ends were entirely closed, so as to prevent the flame from
going out.   This was done, as we understand, for the purpose of carrying the heat
further up the boiler.   Testimony is also given by witnesses tending to show that
this was the manner in which a large majority of the boilers in Fostoria were built
or set.

In the fall of 1886, the defendant company brought natural gas into the city of
Fostoria, and the Sheibley Brothers were anxious to have their steam power
heated by gas.   They made application to the company—to Mr. Corwin, I believe
—and the gas company sent a man there—Mr. Stock, who was to take the meas-

* This judgment was affirmed by the supreme court, without report, November 20, 1894.
2 Legal News, 95.

urements and see whether the boiler was set properly, or was in such a condition that gas could be used as a heating power. Mr. Stock came there and made an examination. One of the Sheibley Brothers was present. Stock took measurements of the fire-box, and also opened the doors into the fire-box, and looked in, and examined with his eye as to the condition of affairs beneath the boiler, and said that they could arrange it so that the boiler could be heated with gas, and that they would send a man down to adjust the matter. He did send a man down, I think, the same day, by the name of Mulvey, and he took steps to put in the heating apparatus. The next day Mulvey remained there doing the work until near night. The fire was then started, and Mulvey remained there a short time and looked at it to see how it worked. He gave the engineer instructions as to the manner of turning on or letting off the gas as the exigencies required, and then went away and went to the hotel, saying that he would be back again in the evening. Sheibley himself, who was somewhat of an engineer, and accustomed to the use of boilers and engines, came in after six o'clock and made an examination. At that time it was found that the flames from the gas were extending around the boiler at the end near the door, and it seems, from the testimony, clear, that during the whole evening up to the time of the explosion, the great bulk of the flame of the gas-burner went directly over the forward portion of the boiler, producing an intense heat, so much so, that in a short time the whole of the brick-work at that point was heated, and the brick itself cracked open so that the flames could be seen, and it was very evident that there was intense heat at that opening. Several engineers in the neighborhood came in and looked at it, and they testify that the heat was very great, and suggested to the engineer that there was too much heat at this point, and one of them, fearing, as he says, that something might happen, went away. The engineer testifies that he turned down the gas, but found that it would not keep the steam up to the standard required in order to propel the machinery, and thereupon he turned it on again. Sheibley testified that he was afraid it would melt the brick and destroy the arch; that he spoke of it to the engineer, but only of its endangering the brick; and thereupon he went down to the hotel and saw Mulvey, and stated to him the condition of affairs at the works and the danger to the brick. Mulvey stated that he had been where gas was used in Pennsylvania, and had worked where they used it, and such heating was usual; that he would be up in a couple of hours, about eight o'clock. He didn't go, however, until after the explosion. The engineer states that he has no recollection of seeing Sheibley, but it is quite evident that he was there, as he states the facts. The engineer continued allowing the gas to be used at about the same gauge that it had been, not changing it, and about eight o'clock the explosion occurred with terrible force, so that the whole of the works around the boiler and engine were pretty much demolished, and the engineer himself was very severely injured, losing the sight of one eye entirely and largely the use of the other, and being scalded to such an extent that he received, perhaps, permanent injuries, and has suffered for a long time before becoming as well as he is.

It appears that after this accident took place the owners of the property went to work and built up again, put in a new boiler and caused it to be heated by gas, as we understand it, putting in the gas themselves and arranging the fixtures. The fixtures were arranged then so that they were placed about eighteen inches distant from where they were before, and, as we understand the testimony, towards the rear of the fire-box, and the burner was so adjusted that the flame, instead of going out directly upwards, came out towards the rear end of the fire-box. They also, at the same time, put the covering of brick in the arch above the water line so that it rested upon the boiler itself. After that, they had no difficulty in the use of gas as a heating power. The flame was carried back to the rear of the fire-box and then back through the flues, and then passed out of the smoke-stack, the heat being thus properly applied. The difficulty with the arrangement as first made, by Mulvey, seems to have been that, for some reason, a very small portion of the heat went

back to the rear end of the fire-box, or passed through the flues, so that while the heat was intense at the front end of the boiler, it was so illy disseminated, that there was but little heat through or around the rear end of the boiler.

The contention of the plaintiff below is that the defendant company put in the gas fixtures, or burner, in an unskillful manner, and that natural gas is a highly dangerous article to use, and so known to be by defendant.

At the time that Mr. Stock was there and made the examination of the fire-box, it does not appear that he saw the opening over the boiler. It does not appear that Mr. Sheibley called his attention to the fact that the boiler was arched over so that there was a hollow arch extending entirely over the boiler, and the testimony as to whether it could be seen by a person looking into the fire-box, is conflicting. The witnesses testified that they didn't know whether he could see it or not, but could have ascertained it if he had had a hoop, or some thin substance, to run over the boiler. The testimony, perhaps, of all the witnesses is, that if it was quite light in the engine room he could have seen it, otherwise not.

It is also contended on the part of the company that the engineer himself was guilty of negligence, in that, at the time the fire was extending so that it cracked the arch over the boiler, he could see that the heat was becoming intense, and, if he had understood his business, he should have known that there was great danger of an explosion. The testimony of the engineers is that the explosion was caused by the severe heat above the water-line, which it seems, creates a gas, which they call oxygen, of a very explosive nature, and such in this case as to cause the explosion.

On this state of facts, the court at the conclusion of the testimony for the plaintiff—the court having been moved by the defendant to take the case from the jury and direct them to return a verdict for defendant—found, First, that there was evidence tending to prove negligence upon the part of the company. Second, that there was no contributory negligence upon the part of the engineer. Third, he held—it is said, that as a matter of law, the defendant company owed no such obligation or duty towards the plaintiff as that it could be held liable to him for the accident which occurred, even though it was found that the company was guilty of negligence.

The case has been very fully argued by counsel, and a great many cases cited, but, in the limited time we have, we cannot go over or discuss all the cases.

The examination of this case has led us to an examination of the case of Burdick v. Cheadle et al., 26 O. S., 393; of Davis v. Guarnieri, 45 O. S., 470, and the case of Kuhn v. Remmler, Adm'x, 16 Bull., 366; Harriman v. Railway Co., 45 O. S., 11; Schindlebeck v. Moon, 32 O. S., 264; Kelley v. Columbus, 41 O. S., 263, and Kelley & Sons v. Howell, 41 O. S., 438, and quite a number of cases in New York and Pennsylvania and some of the English reports, which were cited by counsel in their respective briefs.

The action of the court in this case was based largely, we are told, upon the decision of the Supreme Court in the case of Burdick v. Cheadle, above mentioned.

That case arose in Fulton county. The defendant, Cheadle, was the owner of a building, and had leased it to a party by the name of Mattison, for a term of years, to be used as a store, and had caused shelving to be put in for the use of the tenants. This shelving had become in such a negligent condition that the plaintiff, Burdick, being in the store, trading, received an injury by the shelving falling upon him, and he brought an action both against Cheadle and Mattison, the tenant, and the case proceeded to judgment and a final hearing in the Supreme Court. This syllabus of the case is this:

"The defendant being the owner of a lot of ground, erected thereon a store-house, and afterwards leased the store-room, and agreed with the lessee to construct therein cornices, shelvings and fixtures, in a secure, safe, convenient and proper manner for the sale of dry-goods and groceries, and to keep the premises in good order. The fixtures put up under the agreement were unsafe and inse-

cure for want of sufficient fastenings to the walls of the building—all of which was known to defendant, who, on request of the lessee, refused and neglected to repair. Afterwards, and while the room and fixtures were in the possession of the lessee, the shelvings fell and injured the plaintiff, who was, at the time, in the store-room as a customer of the lessee. Held, the facts stated do not constitute a cause of action against the defendant and in favor of the plaintiff."

There is a very full discussion of the case by the court and quite an extended argument, and the line of argument is, that the owner of the building is not liable, except he had erected his building or kept it or permitted it to become in such condition that it was a public nuisance. In that case, if any injury had happened to the public, the owner might be liable. It was contended, however, that the nuisance, whatever there was, not being on the public street, that the liability to any person who came upon the premises would be regulated by the rules of ordinary cases of that kind. The court held that for injuries arising under circumstances such as were involved in that case, that the person who was in possession of the property as a tenant was the one bound ordinarily to keep the same in repair, and against him the liability would accrue to any person who was invited there by him, and, inasmuch as the party who was injured in that case had come there for the purpose of trading with the tenant, the tenant alone was liable. The court in the decision of the case suggested the proposition that if the carpenter who put up the shelving.had been negligent, there would not have been any liability on the part of the carpenter to any person who should be injured by reason of the falling of the fixtures, and that suggestion of the court is pertinent to this case. That case has recently been confirmed by the supreme court of this state. It came up in the case of Kuhn v. Remmler, *supra*. In that case, the defendant was the owner of a building in Cincinnati, that had been erected without a cellar and with slight foundation walls. The person owning the property adjoining, was about to erect a building and was to dig a cellar, and thereupon the owner of this building made an arrangement with the person who was to dig the cellar for the adjoining building, that he was to so dig it and carry it forward and erect the foundation as that it would support the wall of defendant's building while the work was going on. The first floor was leased to a party who was a manufacturer of brooms. The decedent was in the room of the tenant for the purpose and was at the time transacting business with him in regard to the purchase of brooms when the building suddenly fell and this party was killed. The administrator brought suit against the owner of the building. The case was tried in the superior court, before Judge Harmon, who charged the jury in regard to the liability of the owner of the building, placing his duty and obligation in such a manner that he would be liable to this particular party. It seems, so fas.as the charge is concerned, that the judge made no reference whatever to the Cheadle case. After charging the jury very fully upon the general liability to the public, he says:

"I neglected to say, although it was understood in the charge, that in my opinion if reasonable prudence on the part of the defendant required him to take any steps to prevent the fall of that building, and he failed to take them, which is a question I have submitted to you on the testimony, that the plaintiff can recover, although her husband was in the premises transacting business with a tenant and not with the defendant, because in my view of the law, that duty is one which the defendant owed to anybody who might lawfully be on the premises."

So it seems that the superior court, at the special term, placed the case upon the general obligation of the owner of this property to so take care of his property and deal with it so that no person would be hurt, and that he would be liable to any person who came on the premises. Judgment was for the plaintiff. That case was taken to the general term and was affirmed, and then was taken to the Supreme Court and reversed, following the case of Burdick v. Cheadle, *supra*.

Schindlebeck v. Moon, *supra*, is a case where the doctrine is very fully set forth as to the liability of the tenant to any person who may come upon the prem-

ises where the tenant is in posessesion and may be injured. But we do not classify the case we are deciding under the line of decisions above stated, but under those to be cited later on, for the reason that the gas company was not the owner of this property, but rather had undertaken to do certain work upon it.

But it is said on the part of the plaintiff that this case should be governed by the case of Davis v. Guarnieri, 45 O. S., 470. The facts of that case were substantially these: Guarnieri went to a drug store in the city of Akron and sought to purchase some oil of sweet almonds, to be used in his family for medicine. The clerk who put it up, without asking any question as to the purpose for which it was to be used, gave him, instead of the oil of sweet almonds—which is a harmless drug—the oil of bitter almonds, which is a deadly poison, which he took home, gave to his wife, and she died within a few minutes. Suit was brought against Davis, the owner of the drug store, and the case was contested very hotly through all the courts, and it was contended all the way through by counsel for Davis that there was no such duty owing on the part of the owner of the drug store toward the decedent as would create any liability, however negligent the druggist might have been. Under the 9th paragraph of the case, the court say:

"The plaintiff in error vigorously maintains, however, that neither the facts alleged in the petition, nor those proved upon the trial, establish his liability. The reasoning is, that Davis was under no obligation to the deceased, either by contract or by operation of law. That there was not such a privity of relation between him and deceased as imposed upon him any duty towards her, and that he was not charged in the petition with the violation of any duty arising by operation of law. It is not a sound proposition to say that a dealer in drugs, having in stock, and for sale, deadly poisons, owes no duty to persons who do not deal directly with him in relation to them. The public safety and security against the fatal consequences of negligence in keeping, handling and disposing of such dangerous drugs, is a consideration to which no dealer can safely close his eyes. An imperative social duty requires of him that he use such precautions as are liable to prevent death or serious injury to those who may in the ordinary course of events, be exposed to the dangers incident to the traffic in poisonous drugs. The jury found that Forster, the agent of the defendant, sold a deadly drug to a customer without knowing it was a poison, and without ascertaining for what use, or for whom, it was purchased. This is practically the finding of the jury as indicated in the answers to the second and third interrogatories propounded by the defendant below."

Then it cites the case of Thomas v. Winchester, 6 N. Y., 397, a case where belladonna was put up and labeled "dandelion," and, after passing through several intermediate hands, it was finally sold as dandelion, and a customer was seriously injured. He also cites the case of Norton v. Sewall, 106 Mass., 143:

"If an apothecary negligently sells a deadly poison as and for a harmless medicine, to A, who buys it to administer to B, and gives B a dose of it as medicine, from which he dies in a few hours, a right of action in tort, against the apothecary, survives to B's administrator, and concludes:

"The court is unanimous in the opinion that these facts constituted a cause of action in favor of the administrator of the deceased for wrongfully causing her death."

Another class of cases cited and discussed by counsel, is where a person has erected upon his own property a scaffolding, or some machinery, that is to be used by persons who are employes of persons who have contracted with the owner to do some work about the building, and the employe is injured. One of these cited is Coughtry v. The Globe Woolen Co., 56 N. Y., 124. In that case, the defendant, being the owner of a mill, employed a firm to put a cornice on the mill. The cornice was to be about fifty feet from the ground, and the defendant company had agreed to erect a scaffold for the use of workmen. It did erect the scaffold, and did it in such a manner that it was negligently constructed. The decedent in the case was at work under the employ of the firm that was doing the work, and he was

upon this staging. The staging fell, and he was injured, and brought suit. In that case, the doctrine is laid down very strongly that where persons are the owners of real estate and are called upon to do anything in regard to it, as in this case, in the erection of the scaffolding, and they do it in such a negligent manner that a person who comes upon that to do work—comes upon it really by their invitation or expectation—they are liable to him for any injury that may result to him. That case was recognized in Kelley & Sons v. Howell, 41 O. S., 438, decided by the Supreme Court Commission. The owner of a mine had agreed with a party to carry on the mining business, and the owners were to prop up the roof so as to protect the workmen, whenever he was notified that it was necessary. The owner was never notified to put it up, but did know that the roof was in a somewhat dangerous condition, and he omitted to take care of it, or to repair or protect it, and it fell and injured a workman in the employ of the contractors. The court held that the owner of the property owed a duty to every person who was invited to go upon the property, and to protect the workmen, so that no person should be injured, and that he was liable for the injury because of the ownership that he held of the property, the liability arising from ownership of property, and not from any contract relation between the parties.

Counsel for plaintiff have also called attention to the case of Devlin, adm'x, v. Smith et al., 89 N. Y., 470, which, he submits, supports the claim of plaintiff herein.

In that case, one Smith, a painter, contracted to paint the inside of the dome of a court house. He made a contract with Stevenson, an experienced scaffold builder, to erect the necessary scaffolding, which was to be first-class. Through the negligence of Stevenson, the scaffold was defectively constructed, and, in consequence, while Devlin, plaintiff's intestate, who was in the employ of Smith, was at work upon the scaffold it gave way, and Devlin, falling, received injuries which caused his death. The scaffold was ninety feet high. It was claimed that there was no privity of contract between Stevenson and Devlin.

The court in that case say: "As a general rule, the builder of a structure for another party under a contract with him, or who sells an article of his own manufacture, is not liable to an action by a third party who uses the same with the consent of the owner, or a purchaser for injuries resulting from a defect therein caused by negligence.

"The liability of the builder or manufacturer for such defect is, in general, only to the persons with whom he contracted. But, notwithstanding the rule, liability to third parties has been held to exist when the defect is such as to render the article in itself eminently dangerous, and serious injury to any person using it is the natural and probable consequence of its use, as where a dealer in drugs carelessly labeled a deadly poison as a harmless medicine, it was held that he was liable, not merely to the person to whom he sold it, but to the person who ultimately used it." Citing Thomas v. Winchester, 6 N. Y., 397.

Further on, the court say, speaking of the scaffolding in question: "A stronger case, where misfortune to third persons, not parties to the contract, would be the natural and necessary consequence of the builder's negligence, can hardly be supposed, nor is it easy to imagine a more apt illustration of a case where such negligence would be an act imminently dangerous to human life." These circumstances seem to us to bring the case fairly within the principle of Thomas v. Winchester *supra*.

This case, it will be seen, is really to be classed with the case of Davis v. Guarnieri, 45 O. S., 470.

Now, there is another class of cases to which our attention has been called by counsel for defendant, and that is, where persons are called upon, as in the case at bar, to do some work upon the property of another, or to manufacture an article which is not of itself necessarily dangerous, but only becomes so by the manner in which it is done, and the work has been done in such a negligent manner that it

is insufficient, and an injury occurs to some person who is a stranger to the contract, but who is working in or about the property, or is using it. There is quite a large body of cases of that class, and it is held, in that class of cases, as a general rule, that there is no liability on the part of the person who manufactured the article to any person except those with whom he has had immediate contract; that is to say, the property is of that character that he does not owe any general duty to the public or persons with whom he has not entered into contract. Among these cases may be cited: Winterbottom v. Wright, 10 M. & W., 109; Longmeid v. Halliday, 6 Eng. L. & E., 562; Lock v. Littlefield, 42 N. Y., 351; Losee v. Clute, 51 N. Y., 494; Collis v. Selden, N. L. R., 3 C. P., 494, which I have not time to cite more fully.

The rules of law that we gather from these, are substantially these: The owner of the property is holden to be liable to persons coming upon the property, if he keeps it in such a negligent condition that a person is injured by some negligent act of his; an exception being made where the person in possession of the property is a tenant; although then the owner may sometimes be liable.

A person is also liable who handles any dangerous compounds, like poisons as we have seen in the Guarnieri case, *supra,* or erect a dangerous structure as in the Devlin case, *supra.* And so, where one handles any article in its nature dangerous and destructive, as, for instance, dynamite, he is bound to act so that no person will be injured, and if another is injured, he is liable, not by reason of any contract relation, but because of the duty he owes to all.

There are other cases where an article is not in its nature dangerous, or where one does work not in its nature dangerous, and the injury arises not because of the dangerous nature of the article or work, but from the manner in which the work is done, where there is no liability excepting to some person with whom one contracts, and that liability arises by virtue of the contract relation, and, as to persons outside, there is no liability for injuries received by the negligence of that person, and that because of no duty or obligation to such person.

We are called upon to decide which one of these classes of cases this case will fall under. The Gas Company was not the owner of this property; it stands, in regard to the putting in of these gas fixtures, in the class of those who are called upon by a contract with the owners to do work upon the property of such owners.

It is said that gas is a dangerous article. In some respects it is a dangerous article. We all know that it is explosive when allowed to escape so as to come in contact with flame; but, for the purpose for which this was to be used, being put under a boiler to use for the ordinary purpose of heating, it was not, in our judgment, a dangerous article. It is an article capable of producing a high degree of heat; the testimony shows that it produced perhaps as high a degree of heat as almost any other fuel—although the question was discussed whether corn-cobs might not produce as high a degree of heat and as dangerous as that of natural gas. The negligence, if negligence there was, in this case, was in the manner in which the gas was placed under the boiler—the burner. It is said that the burner was placed too near the front of the boiler—too near the door; that it was placed in such a position that the flame extended upward; that the flame came out in such a manner that the draft would not carry the flame back to the rear of the fire-box, and so on through the boiler, where it should have gone.

The court found, and we think there was some evidence tending to show that there was negligence, in the manner of putting in the burner, and we are of opinion that we are dealing here with the question, simply, as to whether there has been negligence in the manner in which the defendant company has put in the burner for the use of an article of fuel, which is not of itself dangerous, and is not to be classed with dangerous articles. We recognize fully, of course, the doctrine in the Guarnieri and that class of cases; but we are of opinion, upon careful examination of the cases, that this case falls within the class which follow the principle that the company is liable, if liable at all, for negligence in the manner in which it

put in this burner, and that, as a matter of law, there was no duty owing, on behalf of thé defendant company, towards this plaintiff, or towards any person who might lawfully be upon the premises.

We therefore hold that the court below did not err in directing a verdict for the defendant, and the judgment of the court of common pleas will be affirmed.

Lee & Brown, and J. C. Winnes, for plaintiff in error.

Doyle, Scott & Lewis, for defendant in error.